We will hear in Number 232413, also Carbon Activated Tianjin against United States. Good morning, Your Honors. May it please the Court, this next appeal involves the Thirteenth Administrative Review of the Anti-Dumping Order on Certain Activated Carbon, that is AR-13. Here the appellants challenged Commerce's selection of several surrogate values for factors of production, including carbonized materials, which we just discussed, hydrochloric acid, as well as the selection of financial statements for calculating financial surrogate financial ratios. In the interest of time, I'd like to focus on just these three, although happy to answer any questions about arguments on the other issues. So first, briefly, I'd like to address carbonized materials. Like in AR-12, Commerce was presented with a choice between the Malaysia import data under the broader heading that covers wood, charcoal, and coconut shell versus the narrower heading that only covers coconut shell. Unlike in AR-12, here we have findings and evidence about the comparability of coconut shell versus wood charcoal to the input that the respondents actually used, which again was coal-based carbonized material. Commerce found that the evidence ultimately pointed to similarities between coal and coconut shell and not wood-based charcoal. Commerce cited purported differences in the activation process, again citing the ITC report. However, as we explained in our argument earlier, we submit Commerce misconstrues that footnote in the ITC report. The footnote does not say that wood-based charcoal cannot be used to produce steam-activated carbon, and it does not support that inference. Have you put any evidence into the record that suggests wood-based charcoal could be also steam-activated? Well, it's in the scope language, Your Honor. The scope explicitly covers... Well, I know you have an argument about the scope, but I'm just wondering, is there any evidence? I'm not aware, Your Honor, that there was any evidence specifically on that carbon activated or its suppliers used wood-based. I believe that one of the other respondents had a supplier that used bamboo, which seems to be a type of wood but may not be actually covered under that broader category. And also used steam activation? Correct, yeah. But that was a different... But that was not for subject merchandise. It was just mentioned in their purchase history. Commerce also found that coconut shell and coal-based carbonized material both have a substantial amount of micropore surface area. And based on this, they found the weight of the evidence supported the selection of coconut shell. We submit that Commerce selectively quoted from the record, particularly we directed the Court's attention to APPX 04077, which is a chart that the respondents submitted comparing coconut shell, coal-based, and wood charcoal. And in terms of porosity, which is the factor that Commerce cited, both... Well, coconut shell is described as having more micropores. Coal-based carbonized material and wood charcoal are both described as having more mesopores, which would be a larger pore size. And there was another exhibit that was attached to the same submission. This is at APPX 04118 and 4119, which is an article that talks about the differences between the three. What is those pages again? It's not... Sure. It's 04118 and 04119. And Commerce cited one sentence as stating that charcoal-activated carbon filtration has substantial micropore surface area. However, the immediately preceding text actually contrasts coal-based charcoal with coconut shell, suggesting there are differences. And then later it goes on to describe coal-based charcoal as some kinds of coal-based charcoal as having larger pore diameter that is suitable for removing large weight compounds, which is similar to wood-based charcoal. So here again, respondents argued that evidence describes overlap and similarities as well as differences, and that the three products are really on a continuum. We submit Commerce selectively quoted from one sentence and disregarded the broader context, and therefore its decision is unsupported. You think it would make Commerce's choice unreasonable if there were a continuum and it just decided where it was going to draw the line, as opposed to saying, well, there's a continuum and the entirety of the continuum must be included? I think Commerce specifically said that they disagreed that coal-based was in the middle ground. And they only found that there were similarities with coconut shell and disregarded the evidence of similarities with wood charcoal. So it wasn't even really a balancing of the evidence on both sides. And that's why we believe a remand is necessary for further explanation on that issue. The second issue I would like to address is Commerce's surrogate value selection for hydrochloric acid. Commerce's reasoning, this is at APPX 07932 to 07933. Commerce selected Malaysian import data for a subheading that covers hydrogen chloride. And the respondents had argued instead that Commerce should use Brazilian import data for a more specific subheading that covers hydrogen chloride in aqueous solution, which is hydrochloric acid. And Commerce's decision turned on whether there was evidence the respondent, Carbon Activated, had used an aqueous solution in their production of subject merchandise. Commerce stated, and this is at the top of 07933, the evidence on the record only demonstrates the purity level for a portion of the total quantity of HCl used in production. We submit Commerce's decision is unlawful because Carbon Activated clearly reported in its supplemental Section D questionnaire response that its supplier used aqueous hydrogen chloride. And the relevant sentence was actually quoted in the respondent's case brief, that is at scientific formula is HCl is an aqueous solution of acid and its concentration is, and then it provides a range, which is also confidential. And as supporting documentation, Carbon Activated provided these test reports, which show the concentration levels of the HCl that its supplier used in one month of the POR. And that is the exhibit that is at APPX 04049 to 04051. And Commerce never told Carbon Activated that its response was deficient or that it needed to provide additional documentation. The lower court held it was reasonable for Commerce to require parties to demonstrate the purity for all of their purchases of hydrochloric acid or hydrogen chloride. But Commerce never required Carbon Activated to do that. They never told Carbon Activated that their narrative response did not sufficiently demonstrate the input purchased was aqueous hydrogen chloride. And the particular evidence that you recited does or does not indicate how much of Carbon Activated's overall input of this sort is in aqueous form, just that here is one input supplier that at least one supplied in that form? So the question from Commerce in that first supplemental Section D questionnaire was, please identify the type of input purchased. The narrative response said, our supplier purchases aqueous hydrogen chloride, and here is supporting documentation. And the supporting documentation was test results for one month of the POR. And Commerce never came back to them and said, please provide test results for covering the entire POR. They never said, we have a reason to believe you were purchasing something other than aqueous. So that's where the record stood. And Commerce did in fact issue a supplemental questionnaire on Section D, but they didn't ask anything about hydrogen chloride or what type of hydrogen chloride was actually purchased. The lower court also had a sentence in their opinion stating that the evidence that Carbon fails to establish that the substance reported in the test results constitutes aqueous HCl. And while the test reports indicate the concentration, it doesn't explain that the only contaminant diluting its purity was water. We submit the lower court misunderstood the use of purity and concentration in this context. What the test reports showed was a concentration less than 100%, where 100% is pure hydrogen chloride, it's not hydrochloric acid. And so anything with less than 100% hydrogen chloride is a solution. And whether there are contaminants is not relevant to the question of whether it's an aqueous solution or pure. What was the page site again for the question to which the answer you gave was an answer? Yes, Your Honor, the response is quoted in their case brief at APPX 07672. Unfortunately, I don't think the questionnaire, that page of the questionnaire, is in the Joint Appendix. So all we have... That feels important. If the question was tell us about everything and you gave an answer, then presumptively it was about everything. But if we don't have the question, the inference is harder to draw. Yes, Your Honor, I do think it's clear from the case brief where they do quote the questionnaire response and they say in their case brief that what we were asked to report was the type of hydrogen chloride. And here's what we said. So finally, the third issue I'd like to address was Commerce's selection of the financial statements for calculating surrogate financial ratios. Here, Commerce selected financial statements for two Malaysian companies, Century Chemical and Bravo Green. The respondents had argued that Commerce should instead use the financial statement for one or more Romanian companies because the Malaysian financial statements did not disaggregate certain categories of costs. And specifically, neither of them had separate line items for raw material labor or energy. Commerce gave two reasons for rejecting the respondents' argument. First, Commerce found that only Malaysia is a significant producer of comparable merchandise because it was the only potential surrogate country that is a net exporter. Second, Commerce found that despite the lack of disaggregations, they acknowledged the lack of disaggregation, but nonetheless found it was still possible to calculate surrogate financial ratios. We assume that Commerce's reasoning is contrary to law and unsupported by the record evidence. The law requires that Commerce is to value factors of production from one or more potential surrogate countries at a level of economic development comparable to the non-market country that are also significant producers of comparable merchandise. Lower courts have repeatedly rejected an interpretation of significant producer that's based solely on evidence of net exports. That's in Jacobi carbons from the CIT in 2018 as well as in 2019. So Commerce's narrow focus on just this one criteria, that Malaysia was the only net exporter, is contrary to law. Our friends argue that those two Jacobi cases are an opposite because Commerce also cited the fact there were two financial statements from Malaysia while the Romanian financial statement was for a company that produced products other than activated carbon. However, the lower court also rejected this type of analysis. That was in carbon-activated, citation is 503 FSOP 3D 1278, as contrary to Commerce's practice not to evaluate the extent to which a country is a significant producer against the comparative production of other potential surrogate countries. So the mere fact that there were two Malaysian financial statements which both described production of activated carbon versus the Romanian financial statement that described activated carbon plus other products is not enough evidence to conclude that only Malaysia is a significant producer of comparable merchandise. Finally, the Malaysian producers, there was evidence that this carbon was their primary uh product that they manufactured whereas for the Romanian it was perhaps an ancillary product that the Romanian company produced. Is that right? That's correct, but the lower court was faced with a very similar factual record and concluded that that just the simple fact that you have companies that mostly produce or even exclusively produce activated carbon doesn't necessarily mean that that country is the only country that qualifies as a significant producer. My understanding of Commerce and the trade court's opinions was they were they were stacking different little factors weighing in favor of Malaysia. Two financial statements of these two financial statements they were these companies primarily produced this activated carbon and then you know Malaysia was the only company that was a net exporter etc. They there was a stack of different factors that all collectively leaned more towards Malaysia than anywhere else. That's correct, your honor, but again net the courts lower court has been clear that net exports per se is not evidence of significant production and Commerce's policy bulletin instructs Commerce not to rely on a comparison of production levels in the potential Syrian countries. There was a chart somewhere in the briefing that showed just the the actual unit number of of production from all these different countries and Malaysia's raw unit production just looked way bigger than any other of the five countries. Should that matter? Do you know what I'm talking about? Offhand, unfortunately, your honor, I don't recall that chart, but I would submit that in one of the red briefs. Yeah, okay. Well, anyway, let's assume for the moment that there's a chart that shows just for that particular year Malaysia's production, you know, just in terms of numbers and quantity far outstripped any of the other candidate countries. Yes, your honor, and I think the lower courts decision in carbon activated recognize that the policy bulletin specifically says that Commerce will not compare relative production levels between the surrogate countries. So they're supposed to rely on some other evidence. And just finally, very quickly, I see I'm about to get into my rebuttal time. You're past it. Oh, I passed it. Apologies. Well, if you'll permit me, just one final point. Commerce is finding that they can nonetheless calculate financial ratios using the century chemical and Bravo statements is not supported. For example, the Bravo green statement only reported cost of sales and operating expenses with no further breakdown of what is in these categories. Commerce has found in other cases where there is not any detailed breakdown of the line items that are normally reflected in the factors, including labor, energy, raw materials, even transportation, that it's not able to calculate financial ratios because it could result in arbitrarily inflating them. So we cited with a brief site, tapered roller bearings from China and citric acid from China. That's at ABPX0728 to 0729. And I would just direct the court's attention to those cases. Thank you. Thank you. It's on page 13 of your book. Okay. Thank you. That will be the blue one.  Good afternoon, Your Honors. May it please the court. And in the first instance, I'll say that we respectfully request that Commerce be affirmed on all the different issues raised by appellants. But I'll address my remarks to the three they focused on today. Maybe the place to start is at that chart that Judge Chen brought up. Another place one can look at those numbers, which may be equally or more convenient, is Appendix 7919, Note 217. That's in Commerce's determination. It lists all of the, both the import and export amounts for each country involved there. And I think it's worthwhile to say the numbers out loud, right? Malaysia. You think it's easier to read a footnote than a chart? No, but I do think it's set out just in one easy place. I like the chart. Fair enough. Fair enough. I have the numbers, so I'm not looking at either as we're speaking now. But look, Malaysia, it's not close, right? Both in terms of the raw numbers and net exporter. Malaysia imported 10 million and exported 20 million kilograms of activated carbon. Romania exported a much, much lower number. Not 20 million, 20,000 kilograms. One one-thousandth, one one-thousandth of the amount that Malaysia exported. And although appellants are right that Commerce's practice is not to compare countries versus country, it's obviously a big difference. But more importantly, unlike Malaysia, which exported twice as much activated carbon as it imported, so it's a net exporter. Romania not only did it have this small, pitiful amount of carbon that it exported, but it wasn't close in terms of net exporter. They were exporting one-tenth the amount of carbon that they were imported. 20,000 exported, 2 million imported. What's the underlying logical, simple-minded logical reason why the net export or volume makes a difference in overall reliability or something? Because the legislative history of the 1988 Omnibus Trade Act that initiated this provision, which is cited in our briefs, it's House Report number 100-576, F590, which is also cited in Commerce's policy bulletin that is part of the briefing as well. That report says explicitly that a significant producer shall include anyone who's a net exporter of carbon. So Congress, in promulgating the statute, didn't define significant producer in any way, shape, or form. Commerce has this long-standing policy, but Congress was very explicit about net exporter in the accompanying legislative history. It said it shall be. So that's not the only way you can be a significant producer, but it's one way, and it's one significant thing Commerce looks at. I think the important issue here is that Commerce didn't just stop at this net. Contrary to the characterization, Congress didn't just stop at this net exporter issue, but went on to look at the data and decided that the Romanian and the similar Russian data that the appellants were proffering was just not very good data because the companies were not activated carbon companies. They mostly were in other businesses. The Romanian company, Rome Carbon, its principal business was polyethylene, polypropylene, polyvinylchlorine, polystyrene. I mean, it goes on, but consistent with the fact that Romania didn't actually export very much activated carbon, their business was primarily other things other than activated carbon. They had more granular financial data, right? Yes, I mean, in the sense that their financial data- In that way, it can make it more reliable to figure out how to do the- Generally not. Generally not. I don't think the briefing touched on this, but there's plenty of jurisprudence from the courts on this issue saying the data can be as great as you want it to be, but if it's not specific to the input in question, then it's really not great data. And I think that's the issue. The previous litigation that counsel referred to was a previous case, I think the 10th or 11th review, originally Commerce looked at the Malaysian data and said, we're not able to break this out. And so there was discussion about whether you could use the Rome carbon data and whether Romania could still qualify as a decent enough producer based on its production in those years. More recently, and this goes back to both the previous review in which this issue was appealed, but they declined to appeal it to this court. Trial court affirmed us. And in this case, Commerce looked at these financial statements and said that they are able to break out depreciation from overhead costs. We're able to sufficiently make the calculation we need, even if these aren't the best financial statements we've ever used. And we prefer the specificity of actual activated carbon producers who also, when it comes to significant producer, meet our criteria. Also, it meets other surrogate country criteria, specifically the fact that it's from the primary surrogate country, that they can use more than one contemporaneous with the time period. So all those reasons led to this result. Can you get to the hydrochloric acid? Sure. On the hydrochloric acid, I think that there has not been much discussion in the briefing about the underlying questionnaire response that counsel refers to. And this is a theme that flows through a lot of the claims in this case. The issue is that they disagree with a factual finding that Commerce made and the trial court upheld. Commerce made a factual finding that there wasn't enough evidence on the record to convince Commerce that the appellants use only aqueous hydrochloric acid. That's the finding that Commerce made. The trial court agreed that Commerce's finding was reasonable. They are disagreeing with that. It's not this court's role to second guess Commerce's factual finding. The issue in this case is that they had put a couple of pages on the record that, as counsel acknowledged, covers one month of it. It's kind of a sketchy document. It's poorly translated. It has some percentages on it that indicate for one month the percentage of hydrochloric acid that the supplier used may have been less than 100% pure. Is that document in the journal? That document is. That's the same one that they referred to. It's APPX 4048-4051. Commerce found that document insufficient to warrant a finding, like a full finding, that the only type of hydrochloric acid that carbon-activated tangent used was aqueous hydrochloric acid, and do something that would be a pretty big departure, right? Was there a translated version of this in the record? That is it, which speaks to the issues I was talking about. Oh, I wish I did better in Chinese school. Right. So the other thing is, again, the Malaysian data meet all of Commerce's criteria. They're from the primary surrogate country. They're publicly available. It's a good data set. It's contemporaneous, all those things. What the appellants want Commerce to do is not only use this Brazilian data, which is not from the primary surrogate country, and Commerce articulated some issues in its discussion at 79-32-33, but it's problems with the Brazilian data. I mean, one I want to highlight is that the Brazilian data and the Malaysian data are done on two different shipping bases. The Brazilian data is FOB, which Commerce generally doesn't like to use, and the Malaysian data is CIF, which without getting too far in the weeds, because I want to get to the last issue as well. I know what FOB stands for. What is CIF stand for? Cost and Freight. And so you'll see there's a whole section of their brief where they say, oh, don't add money to our, don't add costs to our data because this was all shipped over land between Brazil and Argentina and something like that. Not a good analogy for what's going on with imports and exports to a partially island nation like Malaysia. So Commerce decided the Brazil data was a bad data set. They hadn't proved that they just use aqueous, and that's why Commerce ended up where it ended up. On the carbon, I think a couple of really important points I want to make here. First of all, I'm constrained to disagree with my colleague that these two reviews are the first instance where Commerce made this choice between the category that it did use and the six-digit category that they proffer. Again, in the last review, the AR11 proceeding, which ended up before this court, for which the site is 2023 Westlaw 316-6188. If one goes at the end of star three, right before it switches over page to star four, you'll see this course discussion about why Commerce chose Malaysia over Romania in that case. And the whole issue was that Commerce wanted to use this specific coconut-based surrogate value as opposed to the same six-digit basket category in Romania that they were advocating now. And you won't find it in the circuit decision. You have to go to the underlying trial court decision. In that case, Carbon Activated was saying, well, we don't use coconut. We only use coal. The other party used coconut, and the court kind of said, look, Commerce has been using this for a long time, and one party uses coconut. Commerce's determination was reasonable. More importantly, Council said that Commerce relied on the same ITC report. That is not accurate. There's very specific and more robust evidence on the record of this case that coal, and two things, that coal and coconut are steam, and wood is chemical. And particularly, there's an article that the respondents themselves put on the record at page 4071 and 4072, and I'll try to read it. The type is really small. But it says the same thing, but more directly. Steam is a widely used process because it is generally used to activate both coconut and coal-based carbon. The next page, they talk about wood. It's the opposite. Chemical activation is generally used for the production of activated carbon from sawdust, wood, or peat. So that's one reason why there's more direct evidence on this case that also indicates that Commerce wasn't wrong in the previous review either. Also, and hopefully this is the last point I'll make, your honors. There was also direct evidence that coal and coconut were similar, whereas wood and coal were less similar. There were two bases for this. One is the activation process, which we already went over. Excuse me. That's at page 4071. But the other one is that they had some properties that were more similar. And this has to go to the filtration and pours, right? Coal and coconut both have, although different concentrations, they both have what are called micropores. Coconut has the most micropores. Coal has fewer micropores, but still has micropores and therefore has a similar level of filtration. Wood doesn't really have micropores. It has something called mesopores and macropores. In other words, the pores that are made based on the material and the type of chemical activation process. They're bigger. It doesn't use the same type of filtration. It's not suitable for the same type of uses. And so Commerce actually made that qualitative determination. There is the chart that appellants referred to, but Commerce looked at the surrounding information and other information in those articles that I think are more specific than the chart. At 4118 and 4119 of the record and 4093 of the record, I think the documents speak for themselves, but they basically, despite the chart being a little fuzzy on this, the articles themselves make it clear, or at least Commerce made a finding, and it's a reasonable finding, that coconut and coal are more similar because they're both in the micropore world and have a certain type of filtration. I'm sorry, coal and wood less similar because wood is in the macropore and mesopore world, which is a less similar type of filtration. Coal may be in between the two, but it's closer to the coconut than the wood. Okay, I think we should hear from you. Thank you, Your Honor. Thank you. May it please the Court, Government Counsel has covered the arguments in our briefing and that I intended to make today with respect to why the substantial evidence on the record supports Commerce's determination. I'd like to respond to an argument from Appellant's Counsel that I'm fairly certain I'm hearing for the first time today, which is that for the hydrochloric acid issue, Commerce was obligated to issue some sort of deficiency questionnaire that it did not issue. So there's a specific legal provision that governs Commerce's action here. It's 19 U.S.C. 1677 M.D., and it requires that with respect to questionnaire responses, before applying the facts available provision, Commerce is obligated to identify any deficiency that it sees in a questionnaire response and to issue a supplemental response and allow a party to cure that deficiency. First, that argument is waived. I've not seen or heard of it before in this case, and I took a quick look at the Appellant's opening brief and reply brief, and their table of authorities does not cite that legal provision. It doesn't matter in a sense anyway because that provision does not apply in the surrogate value context. This precise issue came up in the AR-11 appeal that was before this Court. The Court issued a non-precedential decision, but in that decision at footnote two, the Court discusses this exact argument, that in the context of surrogate values, there was some obligation to offer the respondent a chance to submit a supplemental questionnaire on the issue. And the Court squarely says Section 1677 M.D. applies to findings based on data provided in response to a request from Commerce and not to findings based on data voluntarily submitted on a respondent's own initiative as occurred here. I thought Ms. Hartman said that the hydrochloric acid, the aqueous version was in response to a questionnaire, a Part D or something of a questionnaire. It was in their questionnaire response, but the issue of how that product is valued as a surrogate value, that question does not fall under the umbrella of 1677 M. That's what this Court said in the AR11 decision. Since I don't have it in front of me and it's new and I get all of that, I'm trying to understand why. I don't remember the language of 1677 M.D. What you identified as the reason, the precedent or the earlier decision gave for it not being applicable to a surrogate value was that it was not in response to a question, but this one is in response to a question. So the legal provision applies when in response to a questionnaire, the Commerce Department identifies a deficiency in that response and before the department can then go apply facts available or adverse facts available, it needs to provide that company at least one opportunity to cure that deficiency. So that applies in the facts available context. That's what 1677 M.D. applies to. It does not apply here where Commerce is simply looking at what respondents have put on the record and saying, okay, what's the best surrogate value that matches what they're reporting here? Commerce is under no legal obligation to go back to a respondent and say, this test report is two pages. It's not fully translated. It covers only part of the POR period of review. So you need to give us something that's more appropriate so we can determine the appropriate surrogate value. That is not what the statute says. And again, that legal provision has not been cited in a balance briefing. So that issue is waived. And in any case, if you look at the court's opinion in AR11 and footnote two, it squarely says that that legal provision does not apply in the surrogate value context anyway.  Thank you. Thank you. Your Honor, I'll just briefly address a few of the points we just heard. First, just to clarify, we're not arguing that Commerce applied facts available or that the legal provision on facts available is relevant to this case. We're simply responding to the lower court's statement in its decision that it was reasonable for Commerce to require parties to demonstrate the purity level for all purchased HCL. And pointing out that Commerce never required that. Commerce asked in the questionnaire response, what type of input do you purchase? The response was aqueous. And here is one month of supporting documentation. And Commerce never asked any follow-up or required them to report for the full POR. So that is all we are arguing about the questionnaire response for hydrochloric acid. Second, I'd just like to point out, I believe our friends argued that the evidence on this record supports the reasonableness of Commerce's decision in the prior review, where that evidence was not on the prior review. That is post-hoc justification for Commerce's decision in the prior case. And we ask the court to properly not take that into consideration in issuing this decision regarding the previous review. Also point out that in referencing this chart of the various types of feedstock for activated carbon, our friends repeated what Commerce said, which is that the chart describes coconut shell charcoal and coal-based carbonized material as having micropores. And they're trying to distinguish wood-based charcoal as having mesophores or macrophores. What the chart actually says is that coconut shell charcoal is described as having more micropores, coal-based and wood charcoal are described as having more mesopores. So again, the same description. Our friends chose not to point that out to the court. And lastly, very quickly, if I may, on the financial statement issue, just to clarify the lack of disaggregation, our friends said that one of the financial statements, I think they're referring to the Bravo Green Statement, includes a breakout of overhead expenses. It actually just itemized depreciation. So what Commerce did was they treated all of cost of sales as raw materials, all of operating expenses as SG&A, which yielded an SG&A ratio of 29%. And then just two categories of depreciation as manufacturing overhead. And we submit that in prior cases, based on that type of record, Commerce has found it is not able to calculate accurate financial ratios. That's where that will be. Thank you. Thanks to all counsel. Case is submitted. That concludes our business for the day. We will stand in recess.